UNITED STATES, Appellee,

v.

Ellis MOORE Staff Sergeant, U.S. Army, Appellant.

No. 39178/AR.
CM 438897.

U. S. Court of Military Appeals.

May 16, 1983.

For Appellant: *Major Linus Johnson* (argued); *Colonel Edward S. Adamkewicz, Jr.,* and *Major Jerome E. Kelly* (on brief); *Major Elliot J. Clark, Jr.,* and *Major Carlos A. Vallecillo.*

For Appellee: *Captain Kenneth H. Clevenger* (argued); *Colonel R.R. Boller, Major Douglas P. Franklin,* and *Major Ted B. Borek* (on brief).

*Opinion*

COOK, Judge:

Sandra Mae, an 18-year-old civilian female, had sexual intercourse with the accused, a 27-year-old sergeant, in his room at Fort Hood, Texas, on the night of May 22, 1979. According to Sandra Mae, the accused had forced himself upon her; according to the accused, Sandra had previously agreed to "make love" to him and had freely "opened" herself to him. A general court-martial convicted the accused of rape, in violation of Article 120, Uniform Code of Military Justice, 10 U.S.C. § 920, and imposed a sentence that included a dishonorable discharge and confinement at hard labor for 8 years.

Intermediate reviewing authorities approved the conviction and the sentence, and the accused petitioned this Court for further review. We granted review on two issues. 9 M.J. 251 (1980). The first concerns the correctness of the trial judge's instructions on reasonable doubt. We have since decided that issue against the accused. *United States v. Salley,* 9 M.J. 189 (C.M.A. 1980). The second issue concerns the correctness of a ruling by the trial judge allowing into evidence, over defense objection, testimony by three government witnesses qualified as experts. We now decide that issue against the accused. Our determination requires examination not only of the challenged testimony, but of its relationship to the issues in the case. *Womack v. United States,* 294 F.2d 204 (D.C.Cir. 1961), *cert. denied,* 365 U.S. 859, 81 S.Ct. 826, 5 L.Ed.2d 822 (1961). We therefore set out first the evidence independent of that challenged.

## I

## THE EVIDENCE INDEPENDENT OF THE EXPERT TESTIMONY

Sandra Mae had an unusual background. When very young she had been sexually assaulted, regularly and over an extended period, by her natural father, who had threatened to kill her if she ever reported his actions, and, later, by her step-father. While in high school, two "friends" enticed her into a car and had "sex" with her without her consent. She reported the incident but did not know the outcome of her report. She was then 16 years old and living with her mother in Oregon.

In August 1978, Sandra's high school boyfriend, Terry, moved from Oregon to Houston, Texas. Some months later, Sandra joined him "to be engaged and then later married." On her arrival, they were affianced, but did not marry. Shortly thereafter, Terry enlisted in the Army and was sent to Fort Knox, Kentucky. Sandra returned to her mother's home, where she suffered a miscarriage of an unsuspected pregnancy.

At Terry's request, Sandra joined him at Fort Knox. While at Fort Knox, she was "the victim of sexual misconduct" by a "friend." In April 1979, Terry was transferred to Fort Hood. He had been informed by a drill sergeant that he would, at Fort Hood, be "able to draw a casual pay" so he asked Sandra to accompany him. However, on arriving at Fort Hood, he discovered he could not draw such pay. He "tried ... the Red Cross, Emergency Army Relief Fund, ... everything ... [he] could think of" but "couldn't get a dime." He could not "help ... [Sandra] out."

On the day of her encounter with the accused, Sandra had no regular "place to stay." Apparently, she had, on occasion, used a car as a place to sleep; the car belonged to a former schoolmate and friend of Terry, who resided in Building CSC 2–58 at Fort Hood. Sandra had visited Terry in

the early evening. About 7:00 p.m., she left him, walking east on Battalion Avenue. A man in a car drove "back and forth along the road," calling out to her. Walking west on the avenue, Private May approached. Sandra greeted him, and on his response she "told him that a man was following" her in a car, "and she was kind of scared." She asked May to walk with her; he agreed. En route, they "got on the subject of playing pool" and agreed "[t]o play a game." They went to Helen's Hide-Away and played pool with a Sergeant Muse, who was in May's unit, and the female manager of the establishment, who played as Muse's partner.

From a nearby table, Private First Class Jerry Lewis watched the game. He, too, was a member of May's unit and was known to him and Muse.

Lewis left before the game ended. When it ended, May and Sandra also left. Outside the building they encountered Lewis, who had apparently been waiting for a bus. All three engaged in a conversation regarding Sandra's desire to telephone a military police sergeant who she thought would be able to help her obtain a place to stay. The three walked to a nearby public telephone outside a building known as Bowler's Green.

Accused came on the scene while Sandra, May, and Lewis were at the telephone site. It was then about 10:30 p.m. All four agree the accused represented that CID agents were at the entrance to Bowler's Green checking the identification cards of women. Learning that Sandra had no car, the accused suggested they try to hide her before the CID might ask. "[D]irected" by the accused, they went around the side of the building, where it was "dark."[1] All also agree that the initial general conversation concerned Sandra's indecision over whether to continue May's efforts to locate the police sergeant she knew or to go to Building CSC 2–58 to see the friend whose car she had been using. May testified that,

in the course of the conversation, he told Sandra he "had a girlfriend that lived off post" and "she could stay with [her] for the night." The accused represented that he knew where Building CSC 2–58 was located, and he offered to drive Sandra there. For about ten minutes, he urged her to accept his offer "of help." As described by May and Lewis, Sandra's reaction to the accused's persistence was hesitancy or confusion. "[E]ventually," said May, she agreed to go to the accused's barracks. Sandra testified she was "afraid to go," but felt "reassured because Billy [May] was with" her, and she "needed to get to . . . [her] friend's barracks."

In his own testimony, the accused admitted that the group left Bowler's Green to get keys to a car to drive to Sandra's friend's barracks. However, he maintained that May had told him they were going to a party in the "1st Cav" area. En route to his barracks, he concluded the distance to that area was "too far to walk," so he proposed that the party be held in his room, where he "had some beer." He also maintained that he then told Sandra, May, and Lewis that he had two roommates, and he asked whether that would "matter." "Everybody," he testified, "said, no." Thereupon, he announced that, if they went to his room, everyone would " 'make love' "; he indicated to them "exactly what" he meant by those words. May, Lewis, and Sandra denied that the accused made any statement to them about a party. They also denied that they had agreed to " 'make love.' "

Accused's barracks was about 150 to 200 years from Bowler's Green. As they proceeded toward it, the accused, in his words, "grabbed . . . [Sandra's] arm" and "entangle[d]" it with his. As she did not complain or withdraw and had put her other arm around May, the accused "interpreted" her action to mean that "everyone . . . was preparing to go and do what we were going to do." Sandra testified she had "tried to

---

1. CID Agent Boudy testified that he and another agent were on duty at Fort Hood on the night of the events in issue. He stated that neither he nor the other agent had been "at 'Bowler's Green' checking ID cards" that night.

pull away," but the accused had "tightened his grip" and she was unable "to break free."

Accused's two roommates, both of whom were also his friends, were in the room when Sandra and the others entered. Sergeant Rayford Lewis was one roommate; Sergeant Donald Barnes was the other.

Sergeant Lewis was asleep, still wearing his shirt and trousers. He, Barnes, and the accused had, after work, played basketball at the gymnasium; then they purchased several six-packs of beer and had gone to a park to drink and talk. Returning to their room at about 9:30, they had "finished off the beer." Sergeant Lewis was sitting on his bed; he "just layed back and fell asleep." Describing himself as "not a real light sleeper," he testified at trial that he was not awakened by any sound or disturbance between 10:00 p.m. and 1:00 a.m. The accused went "to the bowling alley to see what was happening." Nothing appears as to Barnes' activities in the interval between the accused's departure from, and return to, the room. When the accused and Sandra entered, he was clothed only in his underwear; he immediately donned a robe.

Sandra entered the room and moved to or stood at a position between a wall locker and a bed that the accused identified at trial as his. May followed her into the room, and sat on a chair "offered" by Barnes. As he got "situated," Sandra sat on the bed frame at the edge of accused's bed. Private Lewis sat on Barnes' bed and engaged him in conversation. Private Lewis testified that, as the accused entered the room, he turned out the overhead light, leaving only the light from a blue bulb. Testifying as to what he did on entering, the accused said:

Then I came and sat down and I pulled off my shirt, and I said to her, I said, "Well, I'm ready when you are ready." So, I went over to her, and I was sitting right here. Right in this area. She was standing, so I grabbed her by the hand, pulled her onto the bed, and kissed her on the cheek, and at the same time I was kissing her on the cheek, I kind of unbut-toned her pants, but she pushed me away and she said, "No, not now." So, she got up from the bed and went over to May and said, "I thought you loved me," and from that point she went straight—directly to the door .... So, she put her hand on the door handle. I was just on the corner of the bed which is about two feet from her; ... I just scooted around to this side of the bed and I just grabbed her hand and pulled her onto my lap and said, "I thought you said you were going to get down," was what I asked her. So, she got up, went back around to this side of the bed and layed back on my bed.

Barnes went into the bathroom. His testimony indicates that he left when he witnessed the accused's action in pulling Sandra onto his bed. He stated that when he emerged from the bathroom he saw the accused "on top of" Sandra and "[s]he had her arms wrapped around him." The record contains a long account of what transpired between the incidents to which Barnes testified.

Sandra testified that after Moore removed his shirt, "he said it was time for ... [her] to put out." She declared, "it was time for ... [her] to leave." She got up from the bed frame and went to the door, but before she could open it, the accused "pulled ... [her] away from it." Sandra said she "broke free" and told the accused "to leave ... [her] alone." She "tried for the door again," but the accused "grabbed ... [her] by the hands." Once more she freed herself and "went to the door." Again, the accused "grabbed" her; this time, "he threw ... [her] onto the bed." She stood up but the accused, walking towards her, forced her back against the wall. He told her to remove her shirt, but she refused. He then hit her in the face repeatedly with his fist and hard in the stomach. She started to scream but could not "get a full scream out" because the accused "put his hands over" her nose and mouth cutting off her screams. The accused told her to shut up, and started choking her, saying, " 'Shut up, bitch. I could kill you.' " She shook her head, indicating she "would

be quiet." She "started crying, and" the accused "threw ... [her] onto the bed." She struck her head against the wall or the side of the bed and again "started screaming," whereupon the accused "put his elbow in ... [her] throat and told ... [her] to shut up." She "asked ... [the accused] if ... [she] could go." He replied, " 'What do you think we brought you here for.' " He told her to remove her clothes; that he was " 'tired of ... [her] playing like this,' " and concluded with the remark that he " 'could kill ... [her] so easily.' " He started to remove her pants and panties.

Sandra admitted that she did not "try to prevent" the accused's removal of her clothing. She did so, she said, "[b]ecause he had hit ... [her] so much ... [she] was afraid ... [she] would get hit some more." How-ever, in the belief that it might dissuade the accused from effecting intercourse, she told him that she "had VD."[2] The accused said, " 'Good! Give it to me.' " Then the accused "pulled ... [her] legs apart" and "got into" her, telling her "to put ... [her] arms around him."

During much of the time in this sequence of actions, Sandra cried. She also called upon May for "help," but she said, "He didn't do anything."[3] During the act of intercourse she "was afraid that ... [the accused] was going to kill" her. She unqualifiedly denied that in going to the accused's room she had planned to have "sex with Moore or any of the others," and she insisted she had not consented to intercourse with the accused.[4]

2. In his testimony, the accused denied that Sandra had told him that she had VD. May and PFC Lewis, however, corroborated Sandra.

3. May testified that when the accused "started [having] sex," Barnes asked him if he was "going to" have it. At that point May left the room because he "was scared." He "figured," he said, that "if ... [he] tried anything ... [he] probably would not get out of there alive." When he reached the lobby, Sergeant Barnes caught up with him and asked if he was going to the CID or to the MPs. He did not answer and continued down the lobby. Sergeant Barnes "grabbed" him and "pushed" him into a seat.

4. It would be impractical to set in context the testimony quoted by our dissenting Brother since that would involve detailing large portions of the transcript. Suffice it to say that the testimony of the victim is corroborated in every material aspect by the testimony of Privates May and Lewis. However, I find the following testimony of the accused given during cross-examination very enlightening as to his state of mind:

Q. What led you to believe that Miss Barnett would be willing to consent to have sexual intercourse with you when you suggested that?

A. Because she agreed upon it, sir.

Q. That was after you suggested it. What caused you to believe that she might even consider having sexual relations with you?

A. She was walking with three people—three men.

Q. Just because she is walking with three men, you think she's going to have sex with you?

A. That's what it projected, sir, and the way she was acting.

Q. What do you mean, "The way she was acting"?

A. The way she looked like she would be doing her thing, you know, like flirting.

Q. What do you mean by "Flirting"? Who was she flirting with?

A. You know, she was standing up talking to me earlier, right. She looked at me like, you know, like women would be trying to give you the "eye" or something. You know, I was sitting there. She—I looked at her, she looked at me, and she looked like this, you know. So what I should expect, you know, (sic) so I started talking to her.

Q. And, now she is giving you the "eye". All right, let's assume she is giving you the "eye" now, Sergeant Moore. You've never met this woman before, is that correct?

A. Right, sir.

Q. Now, is it your experience that women that give you the "eye" are willing to have sex with you?

A. You know, it's up to you to talk to the individual, what they want, you know. It's up to you to project an idea of how the conversation might end.. That's the way I always talk to people, you know. Like women, they always do things like that.

* * * * * *

Q. Was there anything that you did, Sergeant Moore, or anything that occurred in that room that you observed that could have caused Miss Barnett to cry?

A. The only thing I did, sir, was kiss her on the cheek; was unbuttoning her pants; she pushed me away; she said, "Not now"; and she went to May and said, "I thought you said you loved me."

Q. Sergeant Moore, in your experience as a—as a man, do you think that a woman who

May corroborated Sandra in all important particulars. He denied that the accused had proposed, and they had agreed, to have sex with Sandra before they went to the accused's room. He testified that when the accused declared "that he was going to get it" from Sandra, Sandra tried to leave, but three times the accused "grabbed her . . . and pulled her back" from the door. In the course of these attempts to leave, he said Sandra screamed "[p]retty loud," and she was crying and was "trying to hit" the accused. "It appeared to . . . [May] that . . . [Sandra] did not want to have sex with" the accused. She, he stated, "resist[ed]" the removal of her clothing and told the accused "she had VD," but the accused indicated that "he didn't care." May said he "was scared," and he thought that if he "tried" to interfere he "would not get out of there alive." He left the room when the accused actually engaged in intercourse. He was followed by Barnes, who, coming up to him in the lobby, "grabbed . . . [his] arm" and "pushed" him into a seat.

Testifying under a grant of immunity, PFC Jerry Lewis also denied that while at Bowler's Green, the accused had suggested having sexual intercourse, and Sandra and the others had agreed. He testified that on entering the accused's room, the accused declared, " 'It's that time,' " and Sandra said she would "just . . . leave." When Sandra reached the door, the accused "stopped her" and "pulled her back." To Lewis, "it looked like she didn't" want to have a sexual relationship with the accused. Lewis stated that the accused "kept grasping" Sandra; that he threw "her against

the wall"; that he "grabbed her" and threw "her . . . on the bed" saying, " 'You're just going to have to give it up.' " Lewis testified further that Sandra "started screaming . . . and carrying on." Her screams, he maintained, were "kind of loud." Lewis represented that he did not see the accused strike Sandra, but he saw him "pull off" her pants and panties. He, too, left the room but returned when the accused "was about finished" in order to have intercourse with Sandra.

On completion of Lewis' act, the accused "came over" and "asked" Sandra if she "was going to tell anybody." Sandra acknowledged that she replied she would " 'say nothing.' " The accused then told her that if she "report[ed] it either he or his friends would kill" her. The accused told Lewis to help Sandra put on her clothes and "get her out of here." Sandra dressed herself and left the room, crying.

When Sandra exited the building, May rejoined her. They went to her fiance, Terry, and Sandra told him what happened. At trial, Terry was permitted to testify that Sandra told him she had been raped. He stated he saw "her face was red" as "from a fall." In his opinion, Sandra "was on the verge of being hysterical." The military police were notified, and Sandra was taken to the post hospital.

## II

### THE ADMISSIBILITY OF THE TESTIMONY OF THE GOVERNMENT'S EXPERT WITNESSES

Colonel Randall qualified as an expert in psychiatry. Over defense counsel's objec-

---

has agreed to have sexual relations with you is going to start crying?
A. Sir, a lady can change her mind anytime, you know, like—
Q. Oh, she changed her mind now. Do you think she changed her mind?
A. I don't know if she did or not. She just pushed me away, sir.
Q. Well then—then, come again, why do you think she started crying? If you have—if you can think of anything that happened in that room that would have started to make her cry.
A. Like I said, sir, she pushed me away, and I kissed her on the cheek. I had my hand on

her pants, right. (sic) She pushed me away, and she went over to May and she said, "I thought you said you loved me"; that's what she told him, and that was it.

Reading this as objectively as possible it appears that when the victim gave the accused the "eye" and accompanied him to his room, she had, in his mind, irrevocably consented to his sexual assault, and neither her tears nor her protests could suffice to change his perception that she had "consented." I think that colloquy also eliminates the perceived need of the dissent for an instruction on mistake of fact as to consent.

tion that the testimony would not be relevant and was merely intended to "inflame the minds of the jury against the defendant," Dr. Randall testified that he had examined Sandra and had found her to be free of "mental or emotional illness." However, he also determined "she was an immature" person, who did "things that" were "non-worldly, sort of over-trusting." Dr. Randall thought it was "very probable" that Sandra would "place herself ... in a sexually compromising situation without realizing it." Under cross-examination, the doctor conceded that a man meeting Sandra "might feel ... she ... [was] trying to lure ... or induce ... [him] into possible sexual activities," but, he insisted he did not "think [it] probable" that if intercourse resulted with Sandra's consent, she would nonetheless "cry ... rape."

Captain Smith had earned a doctorate degree in psychology and had served as an Army psychologist for five years. Over a stated objection by defense counsel that was apparently construed to be the same as that interposed to Dr. Randall's testimony, Dr. Smith testified that standard psychological tests had been administered to Sandra. From those and his clinical impressions in an interview with her, he believed she possessed "superior intelligence," but was "emotionally very immature." In his opinion, Sandra "seem[ed] to be looking for ... an idolized father image," and she "wished" men would appreciate her for her intelligence "more than just for her body."

Like Dr. Randall, Dr. Smith was of the opinion that Sandra "could [unknowingly] place herself ... into a sexually compromising situation" and a male companion could, "in terms of her behavior," "respond [to her appearance and actions] on a sexual basis." Sandra's background of sexual abuse and his psychological evaluation of her led Dr. Smith to believe that Sandra would submit to sexual intercourse if physically struck and threatened with death. He thought she dressed in a "seductive" way in the hope that men would "relate to her." He did not, however, believe it "probable" that she would engage voluntarily in sex, but "later scream rape."

Dr. Groth was the Government's last expert. He was Director of the Sex Offender Program, Department of Correction, State of Connecticut, and an author and lecturer on sexual assaults. Over defense objection that his testimony would be irrelevant and merely "an attempt to ... bolster" Sandra's testimony, Dr. Groth testified as an expert on the psychology of rape. He described rape as "complex" conduct, which, in its "psychological aspect," revealed "three ... components: Anger; power; and sexuality." The primacy of one or another of these components in a particular rape would result in its classification or typing as "[a]n anger rape; a power rape;" or a sexuality ("sadistic") rape. Each type or class had subcategories.

In response to a hypothetical question that set forth Sandra's testimony as to the act of intercourse, Dr. Groth stated that, in his opinion, the act would fit "the description of a *power rape*." A second hypothetical question, based on Sandra's testimony of the sexual abuse she had suffered from her father and stepfather, produced an opinion that Sandra had "instilled" in her, as "a personality trait," a tendency not "to complain or to resist, but to be obedient" to an aggressor, especially "anyone ... [seen] as authority in any fashion." Dr. Groth conceded that apparent cooperativeness on Sandra's part could be "misread" by a male "as consenting" to a sexual relationship. Dr. Groth also admitted that the validity of his opinions depended on the correctness of the facts stated in the hypothetical questions.

A. *The Qualification of a Psychologist to Testify as an Expert on the Mental or Emotional Condition of an Individual*

American judicial opinion is divided on the qualifications of a psychologist, as distinguished from a psychiatrist, to testify to the mental or emotional state of an individual and the impact of the particular state on the individual's behavior. *See United States v. Fields,* 3 M.J. 27 (C.M.A.

1977). In *Fields,* the Court upheld a trial judge's ruling disallowing testimony by a defense witness, qualified academically and by experience as a psychologist, as to the "emotional problem" of the Government's principal witness. Affirmance of the trial ruling was not predicated on the inherent inability of a psychologist to identify and define the nature of mental or emotional conditions, but upon the absence of evidence that the witness possessed the special "training or experience" that would have enabled him to recognize and diagnose "a specific mental ... [state] or character trait and its effect on" an individual's conduct. *Id.* at 29.

In this case, trial counsel examined Dr. Smith on his academic qualifications and his professional experience over a five-year period as a practicing psychologist in the Army. At the end of that examination, civilian defense counsel stated that he had "no objections as to qualifications." Trial counsel examined Dr. Groth on his academic and professional experience as a psychologist. Defense counsel questioned him only to determine whether the scope of his expertise extended to "sexual assault of children." At the conclusion of that inquiry, defense counsel declared that he had "no question about the qualification" of the witness.

At the time of trial, the Manual for Courts-Martial, United States, 1969 (Revised edition), provided that "a failure to object on the ground of a lack of" qualifications as an expert constitutes a waiver of the requirement that such qualifications be shown before the witness is permitted to express an opinion on a matter within his specialty. Para. 138e, Manual, *supra.* Apart from the absence of defense objection, the evidence as to the schooling and experience of Drs. Smith and Groth amply supports the trial judge's determination that they qualified as persons possessed of "specialized training or experience" in respect to the identification and evaluation of personality traits of humans and the effect of particular traits on individual behavior. Para. 138e, Manual, *supra,* (carried forward into current Mil.R.Evid. 702, September 1, 1980); *see Jenkins v. United States,* 307 F.2d 637 (D.C.Cir.1962). Unlike the situation in *United States v. Fields, supra,* the expert witnesses here were properly qualified.

B. *The Relevance of the Experts' Testimony*

■ Qualification as an expert and a purpose to testify on a matter within the expert's "specialty" do not, however, insure the admissibility of what the expert proposes to say. As paragraph 138e of the Manual then provided, the subject of the expert's testimony must be "on a matter ... involved in the inquiry." [5]

■ It will be recalled that at the beginning of the testimony of each expert, defense counsel contended that the testimony was not "relevant." In some respects, however, the testimony of each was quite material to accused's claim that Sandra had consented to their intercourse. Paragraph 199a, Manual, *supra,* points out that if a mentally competent and physically able woman "fails to make her lack of consent reasonably manifest ... the inference may be drawn that she did in fact consent." Dr. Randall testified that Sandra had no "mental or emotional illness"; that her modes of dress and conduct were such as would lead a man to believe she was trying to entice him "into possible sexual activities"; and that she would very likely place herself "into sexually compromising positions." Dr. Smith also testified to Sandra's proclivity for putting herself in "sexually compromising" situations that would make a male companion perceive her as "seductive"; and, Dr. Groth conceded that a male could "misread" Sandra's conduct as consent to a sexual relationship. It cannot be gainsaid

---

5. Mil.R.Evid. 702 states the condition for admissibility as follows:

   If ... [the] specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert ... may testify thereto.

that these parts of the challenged testimony were relevant to the only disputed issue in the case, that is, whether the sex act between accused and Sandra was without her consent. *See United States v. Henderson,* 4 U.S.C.M.A. 268, 274, 15 C.M.R. 268, 274 (1954).

Considering the manifest relevance of some parts of the experts' testimony, trial defense counsel may not have intended his generalized objection to extend to the whole of the testimony of each witness. Appellate defense counsel acknowledge that "the only real issue was consent," but they, too, have not identified specific portions of the testimony they deem irrelevant to that issue. They do, however, comment on two particulars of Dr. Randall's testimony.

(1) *The Relevance of Doctor Randall's Testimony*

As stated in their brief, the two particulars mentioned by appellate defense counsel in respect to Dr. Randall's testimony are:

(a) Colonel Randall stated that ... [Sandra] had no mental or emotional illness but that she could *unknowingly* place herself in a sexually compromising situation.

(b) He added that she was immature and that in his opinion consensual intercourse was not a probability in the case.

The latter portion of defense counsel's second statement incorrectly represents Dr. Randall's testimony. The doctor did not say that, in his opinion, consensual intercourse between Sandra and the accused was not probable. His opinion, in respect to an act of intercourse, dealt with the probability versus possibility that Sandra would, as posited in defense counsel's question, "cry out rape" as a "defense mechanism," if she had actually engaged in intercourse during "one of these [sexually] compromising situations." The testimony was as follows:

[IDC] Q. Is it also possible, Doctor Randall, that given her emotional and state of mind, that if she was given the opportunity, for example, to get into one of these compromising situations, and subsequently she found herself to be seduced, where there was actual maybe intercourse male conduct that took place, is it also possible that in her emotional makeup that once she had considered what she had done, that the defense mechanism she might use would be that she would cry out rape?

A. I really can't answer that.

Q. Is that possible?

A. Well, it is possible, but in this case I don't think probable.

Q. You don't think it is probable?

A. No.

Paragraph 137, Manual, *supra,* which was in force at the time of trial, defined "relevant evidence" in terms of what such evidence is "not." The substance of that definition accords with present Mil.R.Evid. 401, which states that "[r]elevant evidence" is that which has "any tendency to make the existence of any fact ... of consequence to the determination of the action more probable or less probable than it would be without the evidence."

Had Sandra been totally incapable of understanding the act of sexual intercourse or of consenting to it, expert testimony as to her incapacity would be relevant to establish her disability and its consequences on her will to resist. In *United States v. Henderson, supra,* the Court upheld a conviction for rape which, in substantial part, was based on medical testimony as to the manifestation and effects of a less than totally disabling mental condition. In fact, the evidence in *Henderson* related to a mental disorder that had shown "progressive improvement." 4 U.S.C.M.A. at 275, 15 C.M.R. at 275.

In *Henderson,* as here, the act of intercourse was conceded, and the only issue was whether it was achieved without the woman's consent. The medical testimony there indicated the victim suffered from a mental disorder that "on occasion" made her "unable to express overtly her subjective feelings and ideas," and which "manifested [itself] by a fixity of facial expression" that apparently bespoke "acquiescence in" what

was taking place before her. *Id.* at 274, 15 C.M.R. at 274. The medical testimony further indicated that, in consequence of her mental condition, the victim was likely "to be overawed more easily by a demonstration of force than would be usual in a woman of her age." *Id.* at 272, 15 C.M.R. at 272.

In *United States v. Fields, supra,* the psychologist was not properly qualified to testify to the presence and effects of an "emotional problem" of a government witness, but the Court's opinion clearly implies that if he had been qualified he could have testified to the witness' character traits known to him and their effect on veracity. In *United States v. Hill,* 655 F.2d 512 (3d Cir.1981), the Court of Appeals for the Third Circuit upheld the admissibility of expert testimony of the defendant's uncommon "susceptibility to influence" to commit a crime, as evidence relevant to accused's defense of entrapment. *Id.* at 516. *See also United States v. Staggs,* 553 F.2d 1073 (7th Cir.1977).

Looking at Dr. Randall's testimony in regard to Sandra's personality traits, we are satisfied the trial judge had ample justification to attribute to it a distinct tendency to make more probable a finding that Sandra had not consented to intercourse with the accused. We are also convinced that he had ample justification to view the opinions offered by Dr. Randall on the hypothetical questions presented by both trial and defense counsel as within his special expertise and of substantial probative value on the existence *vel non* of non-consent. Para. 138e, Manual, *supra. See also* Mil.R. Evid. 401.

(2) *The Relevance of Doctor Smith's Testimony*

As the summary of his testimony indicates, Dr. Smith testified to substantially the same personality traits of Sandra as did Dr. Randall. The major difference between them is that Dr. Smith provided an opinion on a hypothetical question not presented to Dr. Randall. He stated that, in his opinion, it would be consistent with Sandra's "fear of retaliation" that, if she were struck one or more times by a male who was "respond[ing] on a sexual basis to her" conduct, and the male "threaten[ed] to kill her," she would likely consent to the intercourse. This statement of opinion was comparable to the medical testimony the Court approved in *United States v. Henderson, supra* at 272, 15 C.M.R. at 272, as to the effect of "a demonstration of force" upon a woman suffering from a mental defect. As with Dr. Randall's testimony, the record amply supports the trial judge's conclusion that Dr. Smith's testimony was relevant to the disputed issue of Sandra's non-consent to the sex act.

(3) *The Relevance of Doctor Groth's Testimony*

Dr. Groth's testimony covers two areas: First, he developed a thesis that, according to the primary psychological component present in the act, every rape is classifiable as one of three types. He then detailed the psychological characteristics of each. The second area of Dr. Groth's testimony is composed of his answers to two hypothetical questions. One question was based on Sandra's sexual victimization by her father and stepfather; it elicited Dr. Groth's opinion on certain traits of Sandra's personality. The traits identified were that Sandra would be "less likely to resist" a sexual aggressor, "particularly anyone . . . [seen] as authority in any fashion," and that her response of apparent cooperation could be "misread" by a male as consent to a sexual act.

Our earlier discussion of the testimony of Drs. Randall and Smith in respect to Sandra's personality traits indicates that the trial judge could reasonably conclude that Dr. Groth's opinions as to the traits identified by him were relevant to whether the sex act between the accused and Sandra was with or without her consent. His testimony in this area was, therefore, properly admitted. A different conclusion, however, seems warranted as regards his testimony that psychologists perceive all rapes as classifiable according to one of three primary psychological impulses.

The psychological classification of rape seems to have no discernible tendency to prove that a particular sexual connection was rape. *See Security State Bank v. Baty,* 439 F.2d 910 (10th Cir.1971); *United States v. Hulen,* 3 M.J. 275, 277 (C.M.A.1977). Similarly, no noticeable probative value appears in Dr. Groth's opinion that, if all the facts specified in a hypothetical question were found to be true, the resultant rape would be classified by psychologists as "a *power rape.*" Still, a trial judge has broad discretion to determine whether proferred evidence has sufficient probative value to go before the court members, and his ruling on admissibility is not subject to appellate disapproval unless he abuses his discretion. *United States v. Daughtry,* 502 F.2d 1019 (5th Cir.1974); *United States v. Fench,* 470 F.2d 1234 (D.C.Cir.1972), *cert. denied,* 410 U.S. 909, 93 S.Ct. 964, 35 L.Ed.2d 271 (1973). That we may have ruled differently than the trial judge does not necessarily establish that the judge abused his discretion. As we are convinced that the questionable parts of Dr. Groth's testimony did not influence the court members against the accused in their deliberations on the verdict, we need not decide whether the admissibility ruling was an abuse of discretion.

Several times we have observed that the only contested issue was whether the accused effected sexual intercourse with Sandra by force and without her consent. We have noted the accused testified that, before going to his room, Sandra had expressly agreed to " 'make love' " with him, his two roommates, and May and Lewis. We have detailed his testimony as to the events within the room, which, if believed by the court members, might have disposed them to entertain a reasonable doubt that Sandra had manifested repudiation of the purported agreement. Oppositely, Sandra, May, and Lewis denied the existence of an agreement for sex, and all testified to conduct by the accused and Sandra which, if believed, would compel a finding beyond a reasonable doubt that the accused achieved intercourse with Sandra by force and without her consent. We have no doubt that nothing in Dr. Groth's testimony weighed against the accused in resolution of these conflicts.

That rape is classifiable into three types, according to the primary psychological determinative, is wholly unrelated to whether Sandra had agreed, before she went to the accused's room, to engage in multiple sex. Nor does Dr. Groth's identification of the types of rape have any significant bearing on whether the act of sexual intercourse was or was not with Sandra's consent. Dr. Groth's opinion that, if the acts specified in the hypothetical question posited by trial counsel were established, the sexual intercourse would fit "the description of a *power rape* " is similarly of little import to the issues. Dr. Groth conceded his opinion was "based on the truthfulness of those statements that were made by the alleged victim." The trial judge instructed the court members that each hypothetical question posed to the experts assumed "as true every fact ... asserted in" it, but that, if the court members did not believe "the evidence ... establish[ed] the truth of the asserted facts," they could not "consider the answer[s]," and they "must disregard" them "in ... deliberation on the merits." The judge further instructed the court members they had to find beyond a reasonable doubt that the act charged was accomplished "by force and without the consent of" Sandra. On the record, therefore, we perceive no fair risk of prejudice to the accused in consequence of the admission of those parts of Dr. Groth's testimony we assume to be inadmissible. Article 59(a), Uniform Code of Military Justice, 10 U.S.C. § 859(a).

C. *The Excludability of the Experts' Testimony Because of Unfair Prejudice to the Accused*

At trial, defense counsel also contended that Dr. Randall's testimony was inadmissible because it was inflammatory. Its proffer, he said, was "just a matter of trying ... to prejudice ... [the court members] and inflame ... [their] minds ... against the defendant." We have earlier noted that the objection to Dr. Smith's testimony was not particularized, but as it was "offered on the same basis" as the objection to

Dr. Randall's, we take the whole of the defense objection to apply to Dr. Smith's testimony. No similar objection was lodged in respect to Dr. Groth's testimony.

■ Military courts have, like the civilian courts, recognized that evidence should not be offered merely "for an inflammatory purpose." *United States v. Bartholomew,* 1 U.S.C.M.A. 307, 314, 3 C.M.R. 41, 48 (1952). Current Mil.R.Evid. 403 provides that relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." *See United States v. Thomas,* 11 M.J. 388 (C.M.A. 1981); *United States v. Fields, supra* at 31 n. 8 (Fletcher, C.J., concurring in the result).

■ Appellate defense counsel carry forward the trial contention that, even if relevant, the "probative value" of the expert testimony was "substantially outweighed by the danger of unfair prejudice" to the accused. Part of their argument is predicated on their view of Dr. Randall's testimony, which we have already noted is inaccurate. Part of the argument is based upon the conclusion that the testimony of Drs. Randall and Smith amounted to nothing more than "an imprimatur of worthiness" on Sandra's credibility. Our previous discussion of the relevance of their testimony in regard to Sandra's personality traits sufficiently indicates our conviction that this part of the challenged testimony was not simply a representation "that, as a matter of scientific fact, ... [Sandra] must have been telling the truth," a representation the Court held to be inadmissible in *United States v. Adkins,* 5 U.S.C.M.A. 492, 498–99, 18 C.M.R. 116, 122–23 (1955).

Without belaboring the point, the Court's opinion in *Henderson* indicates, and the evidence here demonstrates, that the testimony of Drs. Randall and Smith had substantial probative value.[6] Some of its elements weighed against the accused, but other parts of it were favorable to him. Viewed in context with all the evidence bearing

directly on the circumstances of the act of intercourse, it impels the conclusion that it did not cause the court members to disregard the evidence and decide the accused's guilt on the basis of passion or bias.

The decision of the United States Army Court of Military Review is affirmed.

FLETCHER, Judge (concurring in the result):

The critical issue contested at this court-martial was whether appellant had sexual intercourse with the alleged victim *without her consent.* Article 120(a), Uniform Code of Military Justice, 10 U.S.C. § 920(a). The burden was on the Government to show that the alleged victim did not consent and she reasonably manifested her resistance to appellant. *See* para. 199a, Manual for Courts-Martial, United States, 1969 (Revised edition). The reasonableness of her manifestations of resistance was to be evaluated by the members in terms of "her age, her strength, and the surrounding circumstances." *United States v. Henderson,* 4 U.S.C.M.A. 268, 273, 15 C.M.R. 268, 273 (1954).

The Government in this case offered testimony from the prosecutrix that she did not consent to this act of sexual intercourse with appellant; and that she communicated this fact to appellant by screams of protestation, by attempts to escape from appellant's barracks room, and finally by physical struggle. Private May, her companion during the alleged incident, corroborated her account of this resistance.

On cross-examination of the prosecutrix, the defense elicited testimony concerning her conduct prior to the alleged rape which was inconsistent with her testimony of lack of consent. Para. 153b(2)(c), Manual, *supra.* In particular, she admitted that she was walking on base without an escort looking for a place to stay that night. She also stated that she met for the first time Private May and played pool with him and

6. In respect to his answers to the hypothetical questions, Dr. Groth's testimony was comparable to that of Drs. Randall and Smith. As to psychologists' classification of rape, his testimony was inconsequential.

other people she did not know. Additionally, she noted that they later met appellant and Private Lewis and went to the former's barracks room around 10:30 p.m. that night. She stated that she objected to appellant's holding her hand while walking to this barracks room, but could not free herself from his grip. However, she admitted that she did not scream, break away, or alert military guards whom they encountered on the trip to the barracks. Finally, she offered testimony concerning her resistance in the barracks room which could indicate less than a maximum effort on her part.

Later in its case in chief, the Government moved to introduce the expert testimony of Doctors Randall, Smith, and Groth on the alleged victim's emotional and mental state of mind (para. 138e, Manual, supra) to demonstrate the reasonableness of her resistance to this attack. Para. 199a, Manual, supra. The defense objected, asserting that the evidentiary facts in this case speak for themselves.[1] Para. 137, Manual, supra. The military judge admitted the evidence on the grounds asserted by the Government and the principal opinion affirms, broadly concluding that such expert testimony was relevant to the issue of lack of consent.

The absence of particularity in the principal opinion causes me to write separately in this case. I note first that the reasonableness of an alleged victim's manifestations of resistance should be evaluated from the time she becomes aware of her assailant's intentions. Doctors Randall and Smith testified that their professional evaluations of her mental and emotional condition led them to believe that she would place herself in "sexually compromising" situations without realizing it. This expert testimony could properly assist the triers of fact in determining when the alleged victim became aware of her plight and, accordingly,

the reasonableness of the timing of her manifestations of resistance. Para. 199a, Manual, supra; see also para. 153b(2)(c), Manual, supra.

Doctors Randall and Smith also offered testimony first on cross-examination and then on redirect examination that it was possible but not probable that a person such as the alleged victim would falsely "cry . . . rape."[2] Their conclusions indirectly reflected their opinions of the veracity of the prosecutrix in this matter based on their professional contact with her. These opinions were a relevant and proper subject for testimony from these witnesses. See United States v. Fields, 3 M.J. 27, 29 (C.M.A. 1977) (Fletcher, C.J., concurring in the result.) In view of the military judge's instructions to the members on the proper use of expert testimony and the defense's opening the door on this matter, no error occurred in the admission of this testimony.

Turning to the testimony of Dr. Groth, I disagree with the principal opinion's assessment of its relevance. Earlier, during the cross-examination of other government witnesses, the defense had established that there was little, if any, evidence of physical trauma on the alleged victim's body in this case. Standing alone and unexplained, this absence of evidence might create an inference that the alleged victim did not actively resist her assailant and furthermore consented to the act of sexual intercourse. See United States v. Henderson, supra at 273–74, 15 C.M.R. at 273–74.

Doctor Groth, based on his experience with sexual assault cases, testified that all rapes are not necessarily accompanied by physical injury. Moreover, accepting the facts as related by the alleged victim, he opined that this was the type of rape, psychologically speaking, which would not generally be accompanied by severe physical

---

1. The Government's expert testimony was not particularly relevant to any affirmative defense that the appellant might have raised that he honestly and reasonably made a mistake of fact in perceiving the alleged victim's consent. See para. 154a (4), Manual for Courts-Martial, United States, 1969 (Revised edition), and United States v. Short, 4 U.S.C.M.A. 437, 16 C.M.R. 11

(1954). However, such a conclusion does not resolve the issue whether it was relevant evidence for the purpose for which it was offered by the Government or any other purpose in this case.

2. See United States v. Dean, 9 U.S.C.M.A. 418, 26 C.M.R. 198 (1958).

injury. His psychological classifications of rape were merely background for the members to understand his expert opinion concerning the meaning of the absence of physical trauma accompanying a rape. The absence of physical trauma and the inference of consent that may be drawn from it are clearly relevant matters in this case. *See United States v. Henderson, supra.*

Dr. Groth also offered his expert opinion on the effect of previous incestuous experiences as a child on a victim's resistance to a subsequent sexual attack. He opined that such persons are less likely to resist their assailant except perhaps by some verbal strategy. *See United States v. Salisbury,* 7 M.J. 425 (C.M.A.1979). It is clear in the present case that the defense had earlier attempted to attack the alleged victim's testimony by highlighting the feebleness of her resistance efforts. *See* para. 199*a,* Manual, *supra.* The Government responded to this attack by bolstering its witness' testimony of non-consent by explaining her lack of more forceful resistance. *See McCormick's Handbook of the Law of Evidence,* § 49 (E. Cleary, 2d ed. 1972); *see also* E. Inwinkelried, P. Giannelli, F. Gilligan, F. Lederer, *Criminal Evidence* 58–59 (1979). Such evidence was clearly admissible. *See* para. 153*b*(2)(c), Manual, *supra.*

In view of the relevance of this testimony and the other evidence of guilt, I do not perceive appellant was unfairly prejudiced by admission of the challenged evidence in this case.

EVERETT, Chief Judge (dissenting):

I

Dealing properly with the granted issue before the Court in this case requires putting it in perspective. In doing so, the best beginning point is the testimony of the prosecutrix, who was the first government witness at appellant's trial for rape.

On direct examination, she testified that on the evening of May 22, 1979, after being at Fort Hood, Texas, for fifteen days, she left her fiance's barracks about 7:00 p.m. enroute to the barracks of a friend. She "said hello to" Private William May, and asked him to walk with her to her destination. They went to Helen's Hide-Away to play pool. PFC Lewis, a friend of May, sat down at a table with them. May and Lewis then went with the prosecutrix to a bowling alley, where May made a telephone call and she went to the restroom. Appellant joined them at the bowling alley, and he and Lewis asked if she would go to Moore's barracks. They went across a field and through a large parking lot, where there were two guards. As they walked through the parking lot, appellant grabbed her hand and interlocked his fingers with hers. The prosecutrix also was holding hands with May. Ultimately May, appellant, and the prosecutrix arrived at Moore's barracks and proceeded through the lobby to Sergeant Moore's room, which was two doors from the lobby on the ground floor.

The prosecutrix entered the room, since this was "[j]ust common courtesy"; and thereupon she "walked over and sat down on Sergeant Moore's bed." Appellant said that it was time for her to have sex with him, whereupon she went to the door of the room but was unable to open it because she "could not understand the lock." According to her, appellant subsequently hit her, put his hand over her face to keep her from screaming, and threatened her. He and Lewis had intercourse with her, after which she went to her fiance's barracks.

In response to further questions from trial counsel, the prosecutrix revealed that as a child she had been sexually assaulted by her father and had sexual relations with him from the time when she was five until age fourteen. Over a defense objection that the sexual assaults in her childhood were not relevant, she was allowed to continue her testimony as a basis for showing "through ... psychiatric testimony" how "this affects her resistance and her consent at the time of the alleged incident." She then explained that her father had had sexual relations with her a few times every week, and that he also was a child beater.

Next, trial counsel sought to elicit testimony that, after the prosecutrix' mother

had divorced and remarried, other instances of sexual intercourse occurred with her stepfather; and defense counsel once again objected on grounds of relevance. He noted that "[i]t appears to me that at this time the sole purpose of this testimony is to gain the sympathy of the trier of fact." The objection was overruled, whereupon the prosecutrix described how, without her consent, her stepfather had sexual relations with her from the time when she was approximately twelve years old. Thereafter, she described how she met her fiance, lived with him for about a year, became pregnant by him, and had a miscarriage. Next, after affirming that she had never "voluntarily made love with anybody except" her fiance, she described how she had been the victim of a sexual assault behind a bowling alley in Lebanon, Oregon. According to her, this incident had occurred when two "friends" invited her to listen to a tape with them in a car, while her fiance and others were bowling inside the alley. Although her "friends" had intercourse with the prosecutrix, who at the time was sixteen and did not consent, and although she eventually reported the incident, it never resulted in a trial.

Later, when she followed her fiance to Fort Knox, Kentucky, where he was staioned at the time, she was sexually attacked again—this time at the hands of a "friend" with whom she was playing pool. She had gone outside with him, fallen asleep, and had awakened with her clothes disheveled. Since she did not "know if" she had "had sex with this guy," she did not report the incident. However, subsequently she became convinced that sexual relations had occurred, for "later on I come up with the symptoms of VD." At Fort Knox, she also had had "run-ins with the military police," because "[t]hey suspected me of prostitution." Near the end of her direct examination, the prosecutrix testified that she was eighteen years old, had not "plan[ned] on having sex with Moore or any of the others," and had done nothing to encourage them. She insisted that she had not consented to having intercourse with Moore; that he had forced her to do so;

and that she had been "afraid that he was going to kill me."

On cross-examination, the prosecutrix conceded that although she had been raped twice before and in one instance the alleged rape had been investigated, no prosecution had resulted. According to her, although she had been visiting her fiance at Fort Hood, she had no place to stay on the evening in question and was to make housing arrangements on her own. While walking with appellant and two others to his barracks, she had passed near guards and had made no outcry; and she had entered appellant's barracks voluntarily. She testified that she had received bruises during the rape and had mentioned them to the doctor and nurses who examined her. Her explanation for being suspected of prostitution by the military police at Fort Knox was that "I was always around men."

While awaiting Moore's trial, she had been staying at Poxon House—apparently at government expense—and she admitted that, while there, at her own solicitation, she had given a massage to a man and had been paid for this service. On still another occasion the prosecutrix had reported to the local police that she had been struck by a Sergeant Laundry and that he had bruised her; and she also had reported this to his company commander. However, no action had been taken on her complaint, because her assailant's "company commander said that the Army protected him from getting into trouble."

Doctor McMorries testified later as a government witness that he had examined the prosecutrix in a hospital emergency room after the alleged rape had occurred. He "found no evidence of bruises, or scars, scratches, or bleeding signs. The only thing that I did find was some soiling on the extremities, and in particular, on the inner thighs." Moreover, no nurse had reported to him any claim .by the prosecutrix that she had been physically beaten. On cross-examination, the doctor verified that the prosecutrix had gonorrhea and that, before the incident with appellant, she had experienced fairly frequent sexual intercourse.

Later in the Government's case in chief, Mrs. Barbara Barnett, the mother of the prosecutrix, was asked whether she had personal knowledge that her husband had beaten her daughter. To a defense objection that this was irrelevant, the assistant trial counsel replied that the Government was seeking to lay the "foundation for expert testimony by ... psychiatrists ... concerning the ... why or the probability, if you will, why Sandra did not fight any more than she did." The objection was overruled. Over a defense hearsay objection, the witness was also allowed to testify that her daughter had told her that "the first time she had sexual intercourse with her father" was when she was "between four and five, and that is as far back as she can remember."

Later, the Government called as a witness, Colonel James Randall, an Army psychiatrist who had interviewed the prosecutrix. When defense counsel objected to the relevance of this psychiatric evaluation of the prosecutrix, the assistant trial counsel responded that "[i]t is the Government's position that the reason Miss Barnett didn't resist any further is because of the incidents that occurred when she was a child." Defense counsel then added an objection that the Government's evidence "is just a matter of trying to influence the tribunal in terms of trying to prejudice them and inflame the minds of the jury against the defendant." The objection was overruled. Colonel Randall then testified that he had found no "mental or emotional illness," and he concluded "that she was an immature young lady," after "taking into consideration her total history background, the way she presented herself, her general behavior, doing things that are sort of naive, gullible, non-worldly, sort of over-trusting individual." After the doctor testified that, in forming his opinion, he had taken into account "the prior incestuous relations that she had with her father and stepfather," he was allowed to express a "professional opinion" that the prosecutrix "could unknowingly place herself in a situation—in a sexually compromising situation without realizing it." His opinion was that this "would

be very probable." Moreover, in Colonel Randall's opinion, "the probability of Miss Barnett placing herself in that situation [was] inconsistent with normal conduct of individuals," since "most people have learned to cope with that by that age."

The next government witness was Captain Smith, a psychologist. While the defense had no objection to his qualifications as an expert in his field, counsel did object to his being "offered on the same basis"— apparently a reference to the expert testimony of the preceding witness. The objection was "noted" by the military judge, who then directed the witness to proceed.

On the basis of psychological tests he had administered to the prosecutrix, Captain Smith testified, over the defense's "original objection," that he had formed certain conclusions about the prosecutrix. According to this witness, one of the tests indicated that the prosecutrix was experiencing "schizoidness" and was "sort of in between the normality and a person really out of touch with reality." However, an intellectual assessment had shown that the prosecutrix had "superior intelligence." The witness further testified on direct examination that, on the two occasions when the prosecutrix had come to his office, "she was dressed in what I would consider to be unappropriate—in an inappropriate manner, and especially under the circumstances." The first time "she was dressed in short shorts"; and "on the second day she was wearing a bathing suit with a military shirt" and "they were very revealing and very seductive." In response to a hypothetical question based on information which the prosecutrix had given to Captain Smith, he stated that it was probable for her to "place herself in a situation with unknown male individuals, without realizing that she was placing herself into a sexually compromising situation." While the witness "could see how a male would respond on a sexual basis to her, in terms of her behavior," he did "not see her as deliberately setting that up, not consciously."

On cross-examination, the witness characterized the prosecutrix as "a seductive per-

son" who "puts herself in positions where she lures men for their companionship" and that while she was "aware of it at a mind level ... emotionally I don't think she is aware... She is emotionally very immature." Moreover, he conceded that she might enter a sexual relationship with one or more men and then later call it rape because of "a defense mechanism" operating "at an unconscious level." On redirect, the witness testified "that it was possible," but not "probable," "that she could be engaged in some sexual activity and later scream rape."

Doctor Nicholas Groth was to be the next government witness; but before he appeared, defense counsel objected in an Article 39a [1] session that this witness, a clinical psychologist, had never examined the prosecutrix and was to testify "regarding the psychology of rape"—a matter which the defense contended was not relevant. The assistant trial counsel replied that the witness would tend to rebut the implication in some of the defense questions to the prosecutrix that she had voluntarily accompanied appellant to his room and consented to have sexual intercourse with him and also

> to explain certain psychology dealing with rape victims in general, which will corroborate and substantiate, in a pattern, the testimony given by Doctor Randall and Doctor Smith concerning this particular victim; how this fits into a particular pattern of rape; that is, rape falls into a particular type pattern; the basic factors that are involved in a rape and how they comply as they break down into a classification of the different types of rape; and certain consistent accepted medical criteria.

The objection was overruled, and Doctor Groth was allowed to appear. After his credentials as an expert had been established to the apparent satisfaction of the judge, defense counsel objected unsuccessfully that his testimony was irrelevant and was "an attempt to try to bolster the testimony of the victim in this particular case." The witness then testified that there are

"three basic components" in every case of rape: "[a]nger; power; and sexuality." The relation of these components and their expression in an assault "may vary from one offender to other." Still another objection was forthcoming from the defense, this time for failure to lay "a proper predicate ... for the offer of any testimony from ... [the] witness"; but this objection also was overruled. Doctor Groth then explained that "what we usually find is that sex is being used to express anger or to express power or some combination of those two factors" and "we see the sexual behavior used to show these other needs; not simply to satisfy sexual desire." Doctor Groth then divided rapes into three classes: "anger rape," "power rape," and "sadistic rape." The second is "the most common" type and is "characterized in terms of aggression by the offender using only whatever force is necessary to gain control of the victim." The witness continued:

> That may not be physical force. That may be verbal threat; it may be intimidation with a weapon, but if it does reach the point of using physical force, usually, the offender will only use whatever is necessary to subdue to [sic] the victim to overcome her resistance, rather than battering the victim or intending to hurt the victim.

The witness based his conclusions in this regard on interviews with some "500 identified rapists and child molesters" whom he had seen during the preceding fifteen years. Doctor Groth then explained that in

> a power rape ... the offender sets out specifically with that intent in mind; in other cases, he simply comes across an opportunity that seems to lend itself to carrying out his intent, and capitalizes on that situation. The victim chosen is frequently determined by vulnerability; the more vulnerable the person, the more powerful the offender can feel in the situation and more in control of the situation.

At this point, defense counsel objected again and argued that the evidence about

1. Uniform Code of Military Justice, 10 U.S.C. § 839(a).

the 500 persons whom Doctor Groth had interviewed did not pertain to the accused then on trial. The objection was overruled. Next, Doctor Groth, distinguished two subcategories of "power rape," as follows:

I think sometimes you can differentiate on the basis of a conversation between the offender and the victim. One may be more commanding; giving orders; instructions. In the other case, it may be more asking personal information; trying to get a lot of personal detail about the victim's life or background, and things of that nature, or responses to the assault; things of this nature.

Next, over another unavailing objection by defense counsel, the witness sought to describe "the character of the conversation between a power rapist and the victim." Doctor Groth then sought to correlate a decision to commit a rape with a perception on the offender's part that

the victim seems to be vulnerable in some fashion; either because of the situation she's in, or because of the level of her intellectual ability or her emotional state, or things of that nature seem to be encouraging to someone who is looking for a victim.

The witness explained that a victim might be "more vulnerable" because of the situation, their "psychological attributes," physical handicaps, or "how the person carries themselves [sic]."

The prosecutor then asked the expert a hypothetical question, which assumed among other things that

He grabs her. She attempts to leave again after breaking loose. He grabs her again; hurls her against the wall; slaps her anywhere from one to seven times; and requires her to have sexual intercourse with him.

On the basis of the facts assumed, the witness testified that "[m]y opinion would be that that fits the description of a *power rape* very accurately." Moreover, it fitted "the *power-assertive* type of offense." In response to a further question, Doctor Groth opined:

You will usually find that the victim is not seriously injured and may show no evidence of physical trauma unless she has very vigorously resisted in the event that he is becoming increasingly [sic] aggressive. But, in most cases of—the victims of *power rape,* we do not find evidence of physical trauma to the body.

According to Doctor Groth, of the offenders who committed *power rape,* about half were married and the other half "had never married at the time I saw them." Reverting to "the hypothetical fact situation" assumed by the prosecutor, Doctor Groth testified that the conduct described "appear[ed] . . . to represent a sexual act evolved of impulse" and explained that "it's kind of an unplanned, spontaneous sexual urge that surges through the offender that he can no longer control and must gratify at all costs."

When the prosecutor then added to his hypothetical question "that the victim was subject to child abuse in the form of incest by her father and stepfather" and asked if "that [would] be likely to have any impact on the amount of force that might be required to overcome any resistance on the part of the victim," defense counsel objected that this "call[ed] for a conclusion by this witness as to the ultimate issue that has to be decided by this tribunal of whether there was consent or whether there was force." The objection was overruled and the witness answered that in his work "with a number of incest victims" he had "noticed that because they have been growing up in a situation where the person typically seen as their protector is, in fact, their victimizer, they tend to learn that it doesn't do very—it's not very helpful to complain or to resist, but to be obedient." In such an instance, the other party "may misinterpret that as consent. Now, when a person cooperates, they may misread that as consenting, when it is in fact simply cooperative."

In response to a further question from the prosecutor as to "whether or not sex is the principal motivator in the particular hypothetical situation that" had been assumed, Doctor Groth answered: "Sex is the

way of expressing needs that are nonsexual that have to do with—of a like issue, so it's not the primary motive. It's simply the primary means of expressing other motives." On cross-examination, Doctor Groth said he had never examined the prosecutrix or even met her. After Doctor Groth's testimony, the Government rested.

Sergeant Moore was the first witness in his own defense. Reduced to capsule form, his testimony was that he, the prosecutrix, and two other soldiers had gone to his room with the expectation of having sexual intercourse; that he had not used force or threats against her; and that she had consented. Various other witnesses then testified for the defense, after which the prosecution offered some rebuttal witnesses.

## II

No matter how unchaste a woman's character may be, she can be the victim of rape. Moreover, even if she lures a man into a sexually inviting situation, he is still guilty of rape if he has intercourse without her consent. However, even when allowance is made for these propositions, the testimony of the prosecutrix in this case almost suffices in itself to generate reasonable doubt. In light of the circumstances under which she had made allegations of rape on prior occasions, her own account of the circumstances under which she arrived at appellant's room, and the absence of any physical evidence indicating that force had been applied,[2] it seems highly arguable that, as a matter of law, appellant was entitled to acquittal, because on the Government's own evidence a reasonable doubt existed that the prosecutrix had denied her consent to intercourse. See Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).[3]

I need not, however, go this far, for even if the evidence sufficed to overcome reasonable doubt, the case certainly was so close

on its facts that evidentiary errors by the trial judge in receiving prosecution evidence would be prejudicial. In my view, such errors did occur in admitting some of the expert testimony.

Writing for the Court in *United States v. Hulen,* 3 M.J. 275, 276 (C.M.A.1977), Judge Cook pointed out:

In *United States v. Ford,* 4 U.S.C.M.A. 611, 613, 16 C.M.R. 185, 187 (1954), we adopted the test set forth in *Frye v. United States,* 54 App.D.C. 46, 293 F. 1013, 1014 (1923), for the admissibility of expert testimony. That test is defined in the following manner:

"Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs."

In recent years, there has been increased judicial receptivity to psychological testimony. *See, e.g., Smith v. State,* 247 Ga. 612, 277 S.E.2d 678 (Ga.1981) (battered woman's syndrome); *United States v. Hill,* 655 F.2d 512 (3rd Cir.1981) (susceptibility to entrapment). Undoubtedly, the Federal Rules of Evidence and their clone, the Military Rules of Evidence, tend to encourage this trend. *See* Fed.R.Evid. and Mil.R.Evid. 701–705. However, the *Frye* test still has vitality. For example, in *Ibn-Tamas v. United States,* 455 A.2d 893 (D.C.Ct.App., 1983), the appellate court upheld exclusion of expert testimony about the "battered woman syndrome" by a trial judge who had concluded

---

2. The medical evidence also impeached the testimony of the prosecutrix that she had been bruised.

3. At the very least, there would seem to be reasonable doubt that appellant had not made

an honest and reasonable mistake that the prosecutrix had granted consent—especially, in light of Dr. Groth's testimony on direct examination that the conduct of the "cooperative" victim might be "misread ... as consenting."

that there had been a failure "to establish a general acceptance by the expert's colleagues of the methodology used in the expert's study of 'battered women.' " *Id.* at 894. *See generally Ibn-Tamas v. United States,* 407 A.2d 626 (D.C.Ct.App.1979). *Accord Buhrle v. State,* 627 P.2d 1374 (Wyo. 1981). In any event, since appellant was tried before the effective date of the Military Rules of Evidence, the *Frye* standard clearly was applicable to his case—whatever might be the effect, if any, of the Rules on the admissibility of scientific evidence and expert testimony in later cases. From my examination of the record, I am convinced that, under the *Frye* standard, much of Doctor Groth's testimony and some of that given by Doctor Randall and Captain Smith was inadmissible and should have been excluded. *Cf. United States v. Fields,* 3 M.J. 27 (C.M.A.1977); *United States v. Adkins,* 5 U.S.C.M.A. 492, 18 C.M.R. 116 (1955); *see generally* Comment, *The Psychologist as Expert Witness: Science in the Courtroom,* 38 U.Md.L.Rev. 539, 557–82 (1979) [hereafter cited as Comment].

A man may be convicted of rape although his victim did not resist to the utmost. *See United States v. Henderson,* 4 U.S.C.M.A. 268, 273, 15 C.M.R. 268, 273 (1954). Indeed, no resistance is required when obviously it would be futile. However, "[i]f a woman in possession of her mental . . . faculties fails to make her lack of consent reasonably manifest by taking such measures of resistance as are called for by the circumstances, the inference may be drawn that she did in fact consent." Para. 199*a*, Manual for Courts-Martial, United States, 1969 (Revised edition). Although, this provision only permits—and does not require—drawing the inference, clearly the Manual intends that the factfinder examine carefully the extent of a woman's resistance in determining whether she refused consent.

In offering Colonel Randall's testimony trial counsel explained that it was the Government's position that the prosecutrix had not resisted more extensively because of incidents in her childhood. In their testimony, Doctor Randall and Captain Smith indicated that because of the incest and

child abuse which the prosecutrix had experienced, she would be especially prone to acquiesce in a demand for sexual intercourse. If the testimony had tended to show that, because of her childhood trauma and otherwise, the prosecutrix lacked the mental faculties to grant consent, it would have been admissible. For example, in *United States v. Henderson, supra* at 271, 15 C.M.R. at 271, evidence was received that the prosecutrix "had suffered from schizophrenia for some fifteen years" and that she "possess[ed] the mentality of a child 'somewhere between 8 and 10 years' of age." However, in the case at bar, Dr. Randall, a psychiatrist, testified as a government witness that, upon examining the prosecutrix, he found her to be free of "mental or emotional illness."

Consistent with trial counsel's expressed purpose in introducing the testimony of Dr. Randall, this testimony might have been construed by the court members to mean that the prosecutrix lacked the mental capacity to give valid consent—as did the victim in *United States v. Henderson, supra.* In that event, the members were misled, for the prosecutrix here was an experienced 18-year-old woman; and none of the government experts testified that she suffered from a mental defect or disorder of a sort that would render her incapable to grant valid consent to sexual intercourse.

The prosecutrix' bizarre past history may explain *why* she would be willing to grant a request for sexual intercourse; but that was not a question for the factfinders to decide. To the extent that the expert testimony went further and sought to explain why, because of her past history, this prosecutrix would have resisted a rapist less strenuously than some other women would have, it was of minimal relevance in the present case. If appellant employed the threats of death to obtain intercourse—as the prosecutrix claimed in her testimony— the absence of resistance would be readily explainable without reference to any unique personality traits of the victim. Submission to intercourse in the face of a threat of imminent death is generally rec-

ognized as a prudent choice, and such a choice is frequently made by persons whose past was much less turbulent than that of the prosecutrix in this case. In short, as defense counsel correctly perceived in making his objections as to relevance, the expert testimony about the prosecutrix' personality traits provided no enlightenment to the court members as to the issues of the present case. On the other hand, this evidence invited the members—in the name of science—to speculate, disregard the evidence about what actually had occurred, ignore their own experience and common sense, and decide on the basis of sympathy for the prosecutrix, even though much of the Government's own evidence indicated that she had voluntary intercourse with appellant.

Furthermore, it seems questionable that the testimony of Dr. Randall and Captain Smith had a basis in generally accepted scientific principles. If a psychologist interviews a woman who has engaged in intercourse without overt manifestation of resistance, how can he be sure that she did not consent, regardless of what she tells him after the fact? Moreover, although the woman's prior experiences might induce her not to resist strenuously even though she did not wish to have sexual intercourse, how can he be sure that those same experiences might not have induced her to give consent to requested intercourse? The testimony of Doctor Randall and Captain Smith suggested that the prosecutrix' childhood experiences would have induced her to acquiescence in a demand by someone like her father or stepfather, who both had committed incest with her when she was young. For some purposes, a distinction is drawn between "acquiescence" and "consent," see, e.g., United States v. Wilcher, 4 U.S.C.M.A. 215, 218, 15 C.M.R. 215, 218 (1954) (search and seizure). However, although common law requirements of resistance in rape cases have been greatly mitigated over the years, it seems unlikely that Congress intended for a servicemember to be subject to conviction

of rape—and imposition of a death sentence, see Article 120(a), Uniform Code of Military Justice, 10 U.S.C. § 920(a),[4]—when he had sexual intercourse with someone who "acquiesced" but did not "consent." As I interpret the Uniform Code, acquiescence by a woman constitutes a defense to rape, unless that acquiescence is compelled by use, display, or threats of imminent physical force.

Thus, when a woman of sound mind submits to intercourse because of events in her past of which the person seeking her sexual favors has no knowledge or notice, he cannot be prosecuted for rape because there exists consent. Contrariwise, the reception into evidence of the testimony of Doctor Randall and Captain Smith would tend to suggest that appellant was guilty of rape because the prosecutrix subconsciously identified him with those persons in her family who had used force years before to obtain sexual favors from her and therefore acquiesced to appellant's desire for intercourse.

Doctor Groth's testimony was offered by the Government to corroborate that of Doctor Randall and Captain Smith. However, the purported corroboration was minimal, since for the most part Groth was describing the characteristics of a "power rapist," while the other two experts had testified about characteristics of the alleged victim. Doctor Groth based his testimony largely on his interviews of some 500 "identified" sexual offenders. How these individuals were "identified" is left unclear by the record. How did Doctor Groth ascertain that there had been no consent on the part of the women with whom his "identified" offenders had sexual relations? Doctor Groth acknowledged that frequently an offender might have misconstrued apparent cooperativeness as consent, but he did not make clear how he had determined that, in fact, a "cooperative" victim of an "identified" offender had not given consent. Of course, if consent had been given, there was no rape—and no sexual offender.

4. Of course, I express no view as to the constitutionality of the death penalty of rape, which was authorized by the Uniform Code in 1951.

Furthermore, even if Doctor Groth's classification and description of a "power rapist" is accurate, it lacked relevance to the case at bar. Although, according to this expert, a "power rapist" commits his offense without using more force than necessary, this characteristic does not tend to establish that a woman who, as in the present case, displays no physical evidence of force has actually been raped, as she claims. While the absence of resistance may be consistent with "power rape," it is equally consistent with voluntary intercourse. Therefore, Doctor Groth's testimony, which tends to indicate that the prosecutrix—whom he had never examined—could have been raped without having any bruises or injuries, adds little to the factfinder's basis for decision. On the other hand, this evidence makes it easier for the factfinder to draw the logically erroneous conclusion that because the rape *could* have occurred as the prosecutrix testified, it *must* have done so.

The principal opinion concedes that parts of Doctor Groth's testimony were "questionable," but it insists that these parts "did not influence the court members against the accused in their deliberations on the verdict." 5 M.J. 354, 364. In so concluding, this opinion fails to recognize that, "because of its aura of special reliability and trustworthiness," the expert testimony in the present case "create[d] a substantial danger of undue prejudice or of confusing the issues or of misleading the jury." *See United States v. Amaral,* 488 F.2d 1148, 1152 (9th Cir.1973); *see also* Comment, *supra* at 589–98.[5]

### III

One other matter about the case troubles me. As I have already suggested,[6] the testimony of the prosecutrix raised the possibility that, at worst, appellant only made an honest and reasonable mistake concerning consent. Moreover, Doctor Groth testified

for the Government that a "power rapist" might misconstrue as consent his "vulnerable" victim's submission to sexual intercourse. Under these circumstances, a defense of honest and reasonable mistake clearly was raised by the evidence.

Moreover, that defense was in no way eliminated by the testimony of appellant—including that quoted by the principal opinion in a footnote. Testifying in his own behalf, appellant made it perfectly clear that he believed the prosecutrix willingly engaged in intercourse with him. The Government's own evidence is in large part quite consistent with the honesty and reasonableness of appellant's belief.

Defense counsel asked if the military judge would be giving an instruction on "[m]istake of fact" as to "[p]erceived consent." Thereupon, the following colloquy occurred:

> ATC: That would appear to be covered in the protestation's paragraph of the rape instruction, Your Honor.
>
> MJ: Well, it normally is.
>
> IDC: That's fine.
>
> MJ: But, again, on the Mistake of fact, it's one of those things where you are taking inconsistent positions.
>
> IDS: Your Honor, I think that the original paragraph instead of Mistake of fact will probably suffice.
>
> MJ: You want to withdraw the request?
>
> IDC: Yes.

The withdrawal of the defense request for an instruction on mistake of fact can hardly be considered a waiver, since it was predicated on an inaccurate assurance that the topic would be covered in another portion of the judge's advice to the court members. In any event, the military judge has an independent and paramount duty to instruct on any affirmative defense raised by the evidence, regardless of defense theories or requests. *United States v. Sawyer,* 4

---

**5.** This is one of several reasons why expert testimony as to "rape trauma syndrome" has been rejected by some courts. *Cf. State v. Saldana,* 324 N.W.2d 227 (Minn.1982); *State v. McGee,* 324 N.W.2d 232 (Minn.1982).

**6.** *See* n. 3, *supra.*

M.J. 64, 65 n. 2 (C.M.A.1977); *United States v. Graves,* 1 M.J. 50, 53 (C.M.A.1975). *See United States v. Sermons,* 14 M.J. 350 (C.M.A.1982); *United States v. Mason,* 14 M.J. 92 (C.M.A.1982); *United States v. Steinruck,* 11 M.J. 322 (C.M.A.1981). Any doubt as to the sufficiency of the evidence to trigger this *sua sponte* responsibility should be resolved in favor of the accused. *United States v. Steinruck, supra; United States v. Staten,* 6 M.J. 275 (C.M.A.1979). Thus, despite the absence of a defense request for such an instruction, it was error for the judge to fail to instruct on mistake as to the

prosecutrix' consent—a defense which had been reasonably raised by the Government's own evidence. Under the circumstances of this case, the failure to give this instruction clearly was prejudicial to appellant.[7]

## IV

Appellant was a victim of prejudicial error, and a miscarriage of justice may have occurred. Accordingly, I would reverse the decision of the United States Army Court of Military Review, set aside the findings and sentence, and authorize a rehearing.

---

7. In *United States v. Carr,* 13 M.J. 12 (C.M.A. 1982), we granted review of an issue concerning mistake of fact as a defense in a rape case.