UNITED STATES, Appellee,

v.

**Jeffrey L. MEEKS, Staff Sergeant**
**U.S. Army, Appellant.**

No. 66,965.
CM 8901737.

U.S. Court of Military Appeals.

Argued May 5, 1992.

Decided Aug. 28, 1992.

For Appellant: *Captain Beth G. Pacella* (argued); *Lieutenant Colonel James H. Weise* and *Captain Michael P. Moran* (on brief); *Colonel Robert B. Kirby, Major Michael J. Kelleher, Captain Alan M. Boyd.*

For Appellee: *Captain Marcus A. Brinks* (argued); *Lieutenant Colonel*

*Daniel J. Dell'Orto* and *Major Joseph C. Swetnam* (on brief).

## Opinion of the Court

SULLIVAN, Chief Judge:

In May of 1989, appellant was tried by a general court-martial composed of officer and enlisted members at Fort Benning, Georgia. Contrary to his pleas, he was found guilty of two specifications of premeditated murder, in violation of Article 118, Uniform Code of Military Justice, 10 USC § 918. He was sentenced to a dishonorable discharge, confinement for life, total forfeitures, and reduction to Private E–1. On September 11, 1989, the convening authority approved the adjudged sentence. On June 25, 1991, the Court of Military Review affirmed the findings of guilty and the sentence in an unpublished opinion.

On January 10, 1992, this Court granted review on the following issue:

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT WHEN HE ALLOWED THE EXPERT TESTIMONY OF FBI AGENT MR. RAY WHOSE THEORY WAS ADOPTED BY THE PROSECUTION.

We hold that the military judge committed no legal error in admitting the challenged expert testimony. *See United States v. Dunn*, 846 F.2d 761 (D.C.Cir.1988); *cf. United States v. Adkins*, 5 USCMA 492, 18 CMR 116 (1955).

The Court of Military Review summarized the grisly facts of this case in its opinion below. It arose from the brutal murders of Second Lieutenant Todd Dunlap and Mrs. Debra Nichols during the night of November 21–22, 1987. A lengthy investigation began, involving the FBI, the Army Criminal Investigation Command (CID), and the state investigators from Alabama and Georgia state police. As part of this investigation, appellant was interviewed because he was a friend of Lieutenant Dunlap. When the case remained unsolved after 12 months, a joint task force was established. Again, appellant was asked to provide a statement to CID. On

January 20 and 27, 1989, appellant made statements which indirectly incriminated him in the murders.

At trial, appellant objected to the prosecution's evidence of an "FBI crime analysis prepared by Mr. John Grant, Mr. Judson M. Ray, concerning the homicide of Lieutenant Todd Dunlop and Mrs. Debra Jean Nichols." In particular, this evidence consisted of an analysis of the crime scene and certain inferences which the homicide expert would draw from it. Defense counsel objected because the testimony was too "speculative," invaded the province of counsel's argument and panel decision-making, and was unduly prejudicial to appellant.

Trial counsel proffered the following summary of the challenged evidence:

ATC: What I believe Mr. Ray would testify to is that this was an organized crime scene. He will go into explaining how the crime scene was restricted to the bedroom, did not overflow into the living room area or other areas of the trailer. He will also testify that there was one offender, indicating that if there were two people, it would be unusual for them to use the exact same method to kill; that there was no evidence of a weaker personality being present; there was no evidence of a second crime being committed; there was blood only on the driver's side of the car, which also tends to indicate there was only one person present; that the offender knew the area, as based upon the use of Debra Nichols' car; that he felt comfortable attacking the victims on their own home territory, there was no problem with the dogs and no signs of forced entry. Also, that he knew the victims, Your Honor, because this is a personal crime. By the nature of the wounds, they were very personal in nature. He also indicated a desire to dominate and control the victims. There were defensive wounds on the victims, Your Honor, which indicate the victims were not intimidated, thereby indicating that they might have known the offender. There were no signs of forced entry,

again, and again, there were post-mortem injuries that indicate it was highly personal to the victims.

MJ: He will be qualified as an expert in crime scene analysis, is that the specific area, then?

ATC: Yes, Your Honor.

MJ: Go ahead.

ATC: He will also testify concerning the controlled rage, is the way he describes it. The neck injuries to both the victims indicate the rage was focused, post-mortem facial injuries to the victim, Debra Nichols; that there was no other crime committed, burglary, robbery, anything along those areas indicates that was anger and emotion that was directed at the victims. He will also testify that the offender wanted to kill both victims, that because of their life styles he had the opportunity to get either of these victims alone, that he came with the proper number of weapons, tape, indicating that he was prepared to kill both victims and did intend to kill both of them. He will also indicate that because of the close personal contact that the offender was probably interviewed early on in the investigation, and finally, Your Honor, that there was blood on the subject, based upon the crime that was committed; therefore, he would need a safe place to return to, to wash up, which would indicate that he would probably have a weak alibi during the time frame.

The military judge then ruled as follows:

MJ: All right, then. The defense motion in part is granted, in that I will rule that the prosecution will not offer any testimony from an expert regarding matters such as we referred to about the probability of the police interviewing an individual, based upon his understanding of police procedures. Subject to his establishing his qualifications on the stand, he will be allowed to testify as to matters derived by him from the analysis of the crime scene, as discussed by counsel, to the extent that it will assist the triers of fact in understanding those matters, many of which would appear to be beyond the experience of average citizens. The matters that defense specifically objected to in its brief regarding physical characteristics as far as age, etcetera, of suspected perpetrator, will not be gone into and the motion in that regard is granted, subject to the prosecution being able to look at that. Should some evidence be presented that might make this proper rebuttal, on rebuttal, then, we don't know what will happen, but as far as the case in chief, it's granted as to those matters, and I will direct the prosecution that this crime scene analysis will not be used in any way to give the court members any inference of an opinion regarding any individual perpetrator. The court is not, and in qualifying Agent Ray, to go in at all to the area of identifying individuals or characteristics of individuals. This will be limited solely to the analysis of the physical aspects of the crime scene. Is that understood?

Counsel for both sides replied affirmatively.

Mr. Ray testified that he had been assigned to the case on June 10, 1988. He stated that he had examined "the post-mortem protocol that was done by the Alabama System," crime-scene photographs, the bodies of the victims, police intelligence statements about the victims, and the area where the crimes occurred. He testified that in his opinion the perpetrator in the instant case was "an organized individual, an individual that had planned and spent some time in the preparation of this crime." Also, in his "professional opinion, ... the person that was responsible went there with sex and killing on his mind," and had come with weapons. When asked about any relationships between the offender or offenders and the victims, Mr. Ray testified that "there [was] a manifestation of familiarity in th[e] crime scene," and that he found "no evidence" of a second perpetrator. Mr. Ray opined that Debra Nichols was "the targeted individual," although the perpetrator wanted both victims together. Finally, Mr. Ray testified that he believed

that the perpetrator was "not going to attract unnecessary attention to himself, because he ha[d] a right to be there" and that he "had a safe place to go" after committing the crimes.

--------

Appellant asserts that the military judge erred by permitting Agent Ray to testify as an expert witness in this case. He contends that the FBI agent's "crime-scene-analysis" testimony was "nothing more than ... speculation," completely unnecessary, and unduly prejudicial. *See generally United States v. Adkins, supra.* Accordingly, he argues that such improper bolstering of the prosecution's case against him warrants reversal of his convictions. *See United States v. Partyka,* 30 MJ 242, 247 (CMA 1990). We disagree.

Mil.R.Evid. 702, Manual for Courts–Martial, United States, 1984, states:

Rule 702. Testimony by experts

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Judge Cox, writing for this Court in *United States v. Stark,* 30 MJ 328, 330 (CMA 1990), summarized our general approach to this rule in these words:

Under Mil.R.Evid. 702, admissibility of expert testimony has been broadened. Anyone who has *substantive knowledge in a field beyond the ken of the average court member* arguably is an expert within that field. *United States v. Peel,* 29 MJ 235, 241 (CMA 1989), *cert. denied,* 493 U.S. 1025, 493 U.S. 1025, 110 S. Ct. 731, 107 L.Ed.2d 750 (1990); *United States v. Mustafa,* 22 MJ 165 (CMA), *cert. denied,* 479 U.S. 953, 107 S.Ct. 444, 93 L.Ed.2d 392 (1986). *Cf. United States v. Farrar,* 28 MJ 387 (CMA 1989). A proffered expert "need not be 'an outstanding practitioner,' but need only be a person who can *help* the" members. S. Saltzburg, L. Schinasi, D. Schlueter, *Mil-*

*itary Rules of Evidence Manual* 589 (2d ed.1986) (citing *United States v. Barker,* 553 F.2d 1013 (6th Cir.1977)). *See also United States v. Hammond,* 17 MJ 218 (CMA 1984). Whether a witness is competent to give expert testimony is a matter falling within the discretion of the military judge. *United States v. Mustafa, supra.*

(Emphasis added.)

I

In this light, our first concern is whether homicide crime-scene analysis is pure speculation or "scientific, technical, or other specialized knowledge." *See United States v. Fleishman,* 684 F.2d 1329, 1337 (9th Cir.), *cert. denied,* 459 U.S. 1044, 103 S.Ct. 464, 74 L.Ed.2d 614 (1982). We note that the military judge particularly inquired into the sources or basis for Agent Ray's testimony, as follows:

MJ: Okay. Let me hear the Government's basis as to all of the matters it intends to offer as those being subject to expert opinion. I'd like first to talk about the crime scene analysis, and from what basis will Mr. Ray testify? Give me an offer of proof. Is this purely a statistical background?

ATC: It's based upon statistics, personal interviews. What it is, Mr. Ray's been working in the National Center for the Analysis of Violent Crimes. The Center itself has been studying these type of crimes for over ten years; they have interviewed all types of criminals; they examine the crime scene; they find out why criminals do certain things; and they are able to zero in on what counts. Using statistical analysis, computer analysis, they are able to determine the common denominators and what those items mean. Things that the panel, since they have no expertise in this area, will not be able to sort out, Your Honor. They will be able to apply—the National Center is able to apply that knowledge and assimilate that info from various fields, including forensic pathology, serology, and may analyze the crime scene relying not only on common sense, Your

Honor, but also based upon their experience as criminal investigators. As for Mr. Ray, he is especially qualified in the field of murder. He has reviewed over one thousand case files and interviews; he has personally interviewed other murderers and, Your Honor, the Government's position is simply that with his expertise and his opinions that are derived from those personal experiences, they would be able to assist the panel in analyzing the evidence that would be submitted today, this week.

█ This showing of expertise can hardly be considered speculation, especially in the absence of a defense showing to the contrary. This is not a case like *United States v. Adkins*, 5 USCMA 492, 18 CMR 116 (1955), where a police investigator baldly asserted that he was an expert in determining the credibility of homosexuals. Crime-scene analysis, *i.e.*, the gathering and analysis of physical evidence, is generally recognized as a body of specialized knowledge. *See generally* 3 *Forensic Sciences*, Chapter 35, Crime Scene Procedures (Matthew Bender 1992); P. Giannelli and E. Imwinkelried, *Scientific Evidence* § 24–1 at 1014 (1986); 2 Wigmore, *Evidence* § 417b at 499 (Chadbourn rev. 1979). Moreover, such evidence has been admitted in several state courts. *See generally Dailey v. State*, 594 So.2d 254, 258 (Fla.1991) (sexual battery); *State v. Asherman*, 193 Conn. 695, 478 A.2d 227, 235 (1984) (bite mark, hair, and blood); *People v. Nolan*, 152 Ill.App.3d 260, 105 Ill.Dec. 336, 338, 504 N.E.2d 205, 207 (2 Dist.1987) (crime scene analysis); *Hill v. State*, 647 S.W.2d 306, 309 (Tex.App. 13 Dist.1982) (defensive nature of wound). Finally, admission of such evidence is consistent with the practice in Federal civilian courts of admitting evidence from qualified police officers concerning the techniques and methods employed in criminal acts. *See United States v. Pearce*, 912 F.2d 159, 163 (6th Cir.1990) (method and techniques employed in drug conspiracy), *cert. denied*, —— U.S. ——, 111 S.Ct. 978, 112 L.Ed.2d 1063 (1991); *United States v. Torres*, 901 F.2d 205, 236–37 (2d Cir.1990) (drug operation); *United States v. Dunn*, 846 F.2d at 762–63 (drug operation); *United States v. Espinosa*, 827 F.2d 604, 611–13 (9th Cir.1987) (drug operation), *cert. denied*, 485 U.S. 968, 108 S.Ct. 1243, 99 L.Ed.2d 441 (1988); *United States v. Andersson*, 813 F.2d 1450, 1458 (9th Cir. 1987) (drug operation).

II

█ Appellant's second challenge to admission of this testimony is somewhat more subtle. He contends that it was not necessary for the members to rely on this expertise to decide this case. *See United States v. Castillo*, 924 F.2d 1227, 1232–33 (2d Cir.1991). A suggested "test" for deciding "when experts may be used" is "whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject...." *See* Fed.R.Evid. 702, Advisory Committee's note. In sum, the proper standard is helpfulness, not absolute necessity (*see United States v. Nelson*, 25 MJ 110, 112 (CMA 1987), *cert. denied*, 484 U.S. 1061, 108 S.Ct. 1016, 98 L.Ed.2d 982 (1988); *United States v. Solis*, 923 F.2d 548, 550 (7th Cir.1991)), and abuse of discretion is our concern on appellate review. *United States v. Snipes*, 18 MJ 172, 178 (CMA 1984).

█ The court members in this case were tasked with resolving a double homicide to which no eyewitnesses testified. The bodies were discovered in horribly mutilated condition, raising questions as to the method and order of killing. The members, confronted with such a grotesque scenario, would be greatly assisted by a professional analysis of the crime scene in light of other murder cases. Moreover, extremely sophisticated observations were made by the agent, not elementary comments concerning well known criminal ventures. *See United States v. Castillo, supra.* A homi-

cide and its crime scene, after all, are not matters likely to be within the knowledge of an average court-martial member. *See United States v. deSoto,* 885 F.2d 354, 359 (7th Cir.1989). Accordingly, we hold that there was no abuse of discretion by the military judge in determining such evidence would assist the members.

### III

Appellant's final challenge to the testimony of Agent Ray is that it was unduly prejudicial to the defense. Mil. R.Evid. 403. *See United States v. Partyka,* 30 MJ at 247; *United States v. Castillo,* 924 F.2d at 1232 n.9. However, the mere fact that this testimony supported the prosecution's case against appellant does not make this evidence unduly prejudicial. *See United States v. Abel,* 469 U.S. 45, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984). Moreover, we note that Agent Ray did not directly opine concerning appellant's guilt but instead offered his opinion concerning certain generic characteristics of the perpetrator derived from evidence at the crime scene. *Cf. United States v. Benedict,* 27 MJ 253, 259 (CMA 1988). Also, the mere fact that the testimony was given by a police officer did not unduly prejudice appellant. The military judge expressly instructed the members on the role of experts and the weight that could be afforded their testimony. *See United States v. Solis, supra* at 551; *United States v. deSoto, supra* at 361; *United States v. Espinosa,* 827 F.2d at 613 n.4. Finally, the Government did not use this expert's testimony to parade an impermissible theory of guilt before the members. *See United States v. Castillo, supra* at 1234. Again, we hold that there was no abuse of discretion on the judge's part in admitting this evidence.

The decision of the United States Army Court of Military Review is affirmed.

Judges COX, CRAWFORD, GIERKE, and WISS concur.